US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

NOV - 1 2018

DOUGLAS F. YOUNG, Clerk
By
                    Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS

|  |  |
|---|---|
| WALMART INC., a Delaware corporation; WAL-MART STORES EAST, LLC, an Arkansas limited liability company; WAL-MART STORES EAST, L.P., a Delaware limited partnership; WAL-MART.COM USA, LLC, a California limited liability company; WAL-MART STORES ARKANSAS, LLC, an Arkansas limited liability company; WAL-MART STORES TEXAS, LLC, a Delaware limited liability company; WAL-MART LOUISIANA, LLC, a Delaware limited liability company; and WAL-MART PUERTO RICO, INC., a Puerto Rico corporation, <br><br> Plaintiffs, <br><br>    v. <br><br> SYNCHRONY BANK, <br><br> Defendant. | Case No. 18 CV 5216 TLB <br><br> **COMPLAINT** <br><br> **JURY DEMANDED** |

Plaintiffs Walmart Inc.; Wal-Mart Stores East, LLC; Wal-Mart Stores East, L.P.; Wal-Mart.com USA, LLC; Wal-Mart Stores Arkansas, LLC; Wal-Mart Stores Texas, LLC; Wal-Mart Louisiana, LLC; and Wal-Mart Puerto Rico, Inc. (collectively, "Walmart") allege the following claims for relief against Defendant Synchrony Bank ("Synchrony"), on information and belief except as to Walmart's own conduct:

## I.     INTRODUCTION

1.     For nearly twenty years, Synchrony and its predecessors at General Electric Company (GE) have provided credit card services to Walmart, extending credit to Walmart customers through Walmart-branded credit cards. Walmart has recently become aware that

1

Synchrony has breached the contract governing this credit card business in several significant ways. In July 2018, Walmart announced it was terminating this nearly two-decade relationship. Walmart now brings this lawsuit to recover damages for the losses it has suffered from Synchrony's breaches of contract.

2. Synchrony recently admitted publicly that it deliberately underwrote the Walmart/Synchrony credit card program in a way that exposes the program to significant—in Synchrony's words, "unique"—credit risk. Synchrony has an explicit, publicly declared business strategy of underwriting different credit card programs differently depending on their profitability. As Synchrony CFO Brian Doubles explained in an earnings call in 2017: "[O]ur underwriting is customized and we underwrite differently whether it's by platform, by program, we target different loss rates depending on the overall profitability of those programs." Synchrony openly admitted that it applied this business strategy to Walmart. Specifically, Synchrony said it took on a "unique" level of "credit risk" with the Walmart/Synchrony credit card program (that is, Synchrony extended credit to riskier customers in the Walmart/Synchrony credit card program as compared to other programs) because the contract between Synchrony and Walmart gave Synchrony what it viewed as "acceptable return" for that risk. As Synchrony CFO Brian Doubles stated in a July 27, 2018 earnings call, in response to a question asking about the Walmart/Synchrony credit card program: "Look, this program was **somewhat unique in terms of the profile.** That became a challenge for us from an economic standpoint. And in this case, we just **weren't able to earn a return that was in line with the credit risk of the portfolio. Under the old agreement we were earning an acceptable return for that risk.** In the renewal discussions it became clear that we weren't going to be able to maintain that **acceptable return level for the risk that we are taking**" (emphasis added).

2

3.  ███████████████████████ The contract that Synchrony CFO Brian Doubles referred to as the "old agreement"—that is, the contract currently in place between Walmart and Synchrony, which will expire in ████ because Walmart has chosen not to renew it—███████

████████████████████ ███████████████████████

████████████████████████████████

████████████████████████████ Synchrony has admitted, in its own public statements, █████████████ ███████: it applied to Walmart its business strategy of underwriting programs differently depending on profitability; taking on "unique" credit risk in the Walmart portfolio because it believed the Walmart contract gave Synchrony "acceptable return" for that risk.

4.  ████████████████ ██████ ████████

████████████████████ ████████████

███████████████████ █████████████

███████████████. ████████████████

██ ████████ ████████ █████████████

██████████████████████████████████

████████████ █████████ ███████ ████████

████████████████ ███████████ ███████

█████████████████████ ██████████

██████████████████ ████████████

██████████████████████ ████████████

████████ ██████████ █████████████ █

██████ ██████████████████████

5. 

These breaches, █████████████████████████████ ████████████████████████████████ have caused substantial damages to Walmart, which now brings this lawsuit to recover its damages from Synchrony's conduct.

## II.   THE PARTIES

6.   Walmart Inc. is a Delaware corporation with its principal place of business in Bentonville, Arkansas.

7.   Wal-Mart Stores East, LLC is an Arkansas limited liability company.

8.   Wal-Mart Stores East, L.P. is a Delaware limited partnership.

9.   Wal-Mart.com USA, LLC is a California limited liability company.

10.   Wal-Mart Stores Arkansas, LLC is an Arkansas limited liability company.

11.   Wal-Mart Stores Texas, LLC is a Delaware limited liability company.

12.   Wal-Mart Louisiana, LLC is a Delaware limited liability company.

13.   Wal-Mart Puerto Rico, Inc. is a Puerto Rico corporation.

14.   None of the plaintiffs has a principal place of business in Utah. None of the plaintiff partnership or LLC entities has as a direct or indirect owner either of the following: (1) a

corporation incorporated in, or having its principal place of business in, Utah; or (2) an individual residing in Utah.

15.　　Synchrony Bank is a federal savings association as defined by 12 U.S.C. § 1813(b)(2) with its main office in Draper, Utah.

### III.　　JURISDICTION AND VENUE

16.　　This Court has jurisdiction under 28 U.S.C. § 1332. There is complete diversity between the parties as defendant Synchrony Bank is a resident of Utah for federal diversity jurisdiction purposes and none of the plaintiffs are residents of Utah. The amount in controversy will far exceed the diversity jurisdiction threshold of $75,000.

17.　　Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Specifically, Synchrony employs dozens of employees in this District specifically to service the Walmart/Synchrony credit card program. Additionally Synchrony employees, including senior executives, and/or agents have made contact with Walmart via face-to-face meetings, telephone conferences and correspondence in Arkansas; and Synchrony is a party to a contract with Walmart that involves making payments to Walmart, which is headquartered in this District.

### IV.　　FACTUAL ALLEGATIONS

#### A. Walmart, Synchrony, and the Walmart-Synchrony Credit Card Program

18.　　Walmart started in 1962, when Sam Walton opened the first Walmart store in Rogers, Arkansas. Walmart now has over $300 billion in annual net sales in the U.S. (not including sales from Sam's Club, a membership-only warehouse club), stores in all 50 states, and multiple online channels including walmart.com.

5

19.     Synchrony Financial is a consumer financial services company and the largest provider of private label credit cards in the United States based on purchase volume and receivables. Synchrony Financial offers credit products primarily through its wholly owned subsidiary Synchrony Bank ("Synchrony"), formerly known as GE Capital Retail Bank, a federal savings bank. Synchrony Financial separated from General Electric Company ("GE") in November 2015, following the completion of an exchange offer in which GE exchanged shares of GE common stock for all the remaining shares of Synchrony Financial common stock that were owned by GE.

20.     Walmart began offering a consumer credit card program with a GE-owned bank (a Synchrony predecessor) in 1999. The contract governing that program was amended and restated in ▮▮▮▮, and most recently in ▮ as the currently governing ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ Agreement, ▮▮▮▮▮▮▮▮ (together with subsequent amendments, the "Agreement"), between Walmart and Synchrony.

21.     The Agreement provides for ▮▮▮▮ between Walmart and Synchrony ▮ ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮ ▮ ▮▮▮▮.

**B. Synchrony's Breaches of the Agreement**

22.     Synchrony breached the Agreement in three ways. **First**, Synchrony ▮▮▮ against Walmart by using ▮▮▮▮▮▮▮ by Synchrony's own admission ▮▮▮▮▮▮ ▮▮▮ that, in Synchrony's words, were "▮▮▮▮▮ ▮"—that is, in Walmart's ▮▮▮▮. **Second,** ▮▮▮▮

6



. **Third**, after U.S. corporate taxes were cut significantly in 2017 ████████████████████████████████ ██████

██████████ ████████████████████████████████████████ ██ ██████████████ ████████████████, ██████████████ ██████████.

**1.   Synchrony Breached the Agreement by** ████████ ████████████████

23.   ████████████████████████████████████ ██████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ ██ ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████.

24.   Synchrony's own public statements ████████████████████████

████████████████████. Synchrony has publicly described a business strategy of applying different underwriting guidelines to different programs depending on the profitability of each program. As Synchrony CFO Brian Doubles explained in an earnings call in 2017: "[O]ur underwriting is customized and we underwrite differently whether it's by platform, by program, we target different loss rates depending on the overall profitability of those programs." Synchrony

7

also stated publicly that it applied this business strategy to Walmart. Specifically, Synchrony said it took on a "unique" level of "credit risk" with the Walmart/Synchrony credit card program (that is, Synchrony extended credit to riskier customers in the Walmart/Synchrony credit card program as compared to other programs) because the Agreement gave Synchrony what it viewed as "acceptable return" for that risk. As Brian Doubles stated in a July 27, 2018 earnings call, in response to a question asking about the Walmart/Synchrony credit card program: "Look, this program was **somewhat unique in terms of the profile.** That became a challenge for us from an economic standpoint. And in this case, we just **weren't able to earn a return that was in line with the credit risk of the portfolio. Under the old agreement we were earning an acceptable return for that risk.** In the renewal discussions it became clear that we weren't going to be able to maintain that **acceptable return level for the risk that we are taking.**" (emphasis added).



    25.    These public statements ███████████████ ██████████.

    26.    Synchrony's business strategy, ███████████ ██████████



27.     The U.S. economy did not enter into a recession between 2015-16 and 2017-18, █

█████████████████  ██████████  ████████████████████. In fact, Synchrony

has consistently expressed its belief over this period that "the consumer is still generally healthy"

and "[t]he overall macro environment is pretty strong" (Brian Doubles (CFO), July 22, 2016

Earnings Call) and that the "consumer is in good shape" (Margaret Keane (CEO), May 31, 2018

Sanford C. Bernstein Strategic Decisions Conference).

28.



███████████. Walmart has over $300 billion in U.S. net sales (not including sales at Sam's Club)

and stores in all 50 states; ████████████████████████████

██████.

29. 



30. ███████  ████████████  ████████████████████████
████████████████████████████████  ██  ████████████████
████████████  ████████  ████████████████████████  ████████  ██
████████████████  ████████████████████  ████████████████████
████████████████████████████████  ████████████████████
████████████████



31. ████████████████████████ ██████████ █████████
████████ ████████████ █ ████████ █████ ██████ █
███ ███ ███ ██████ █████████████ ████████████
█████████ ██████████████████ ██████████████
██████ ████ ████ ████ █████ █████ ████████
████████████████████████ █████████████ █
███ █████ ██████ █████ █████████████.

32. ██████████████ █████████████ █████████
████████ ████████ ███████████████████████



33.     Publicly, Synchrony was touting its mobile capabilities as one of the keys to its competitive success. Synchrony CEO Margaret Keane said in a July 2015 earnings call that the "whole digital strategy" was a "big win" and "mobile applications are really growing." As she put it, "[A]s the consumer behavior shifts to mobile[,] I think one big advantage that we have versus many other general purpose credit cards is you can apply and buy immediately and you could do it on your mobile phone," which she called "a big, big opportunity for us." In a January 2017 earnings call, CEO Margaret Keane said that growth in mobile applications was "a very strong metric and one that we feel very good about." And in May 2018, CEO Margaret Keane said that "a lot of what we're trying to do right now, and this is in both the big retailers down to the smaller retailers, is helping them accelerate their mobile capabilities . . . ."





36.

(A "dual card" is a card that can be used both at Walmart and at other retailers, similar to a general purpose credit card, in contrast to a "private label credit card" that can only be used at Walmart.)



37. 

. Synchrony has said publicly that dual card customers are lower risk than private label credit card customers. Synchrony CFO Brian Doubles said in an earnings call in 2015 that dual card "tends to be [a] higher FICO customer" that generates "lower losses."

38. ████████████████████████████████████████████████

██████████████████████████████████████████████ Synchrony has publicly stated that its general strategy for converting private label credit card customers to a dual card is a "low and grow" strategy: "[W]e start out consumers with a smaller line PLCC [private

label credit card] card. And then over time we watch them and then we upgrade them to a larger PLCC line and then ultimately we upgrade them into a Dual Card. We like that strategy. We think it's prudent risk management . . . ." (Brian Doubles (CFO), Jan. 23, 2015 Earnings Call). Synchrony even told the public that "low and grow" had been a long-term strategy: "This is a strategy that we've had in place for four years where we start consumers up with a lower line on PLCC and we upgrade them overtime [sic], and that strategy has been pretty consistent." (Brian Doubles (CFO), Apr. 17, 2015 Earnings Call). Synchrony went on to say it would disclose to investors if it ever were to change that strategy: "If we are going to change that in the future and do something bigger we would always come and we will describe it at that point." (*Id.*)



41. 

42. ████████████████████████████████████████

████████████████████████, Synchrony was publicly touting the strength of

the U.S. economy and the U.S. consumer. CEO Margaret Keane said in May 2018: "[W]e entered

2018 with an economy that I think is in good shape. We feel the consumer is in good shape."

Similarly, in May 2018 CFO Brian Doubles said: "I think we still feel pretty good about the U.S.

consumer. I think the consumer is strong. They're spending. Unemployment levels are at historic

lows right now. So we feel pretty good about the environment."



43.

44.

45.

2. **Synchrony Breached the Agreement by** ███████ ████████ █

   ████ ████ ████

46.  ██████ ███ █████████████████████████████████████

██████████████████████████████ ███████ ██ ████████

███████ ██████████████████████ ████████████ ████████

██████████████████████ ███████████ ████████████

█████ ████ ████ █████ █████████████ █████████████ ████████

█████████████████ ██ ████ ████████████████████

███████████████████████ █████████ █████████

█████ ██████████████████████ ███████ ██████

47.  ███ ████████ ██████████████████████████████ ██

██ ███████████████████████ ████████████ ████ ██

███████████████████████████████████████████████

████████████ ████████████

48.  █████████████████████████ █████████████

██████ ████████████████████████████████████████

██████████████████████████████ █████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████ ███████████ ██████████ ████

███████████ █████ ████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

49. ██████████████ beginning in August 2014, Synchrony Financial entered into several transactions to effect the first steps in GE's planned staged exit from Synchrony Financial's business and the independent existence of Synchrony Financial as a public company separate from GE, including closing an initial public offering (IPO). In approximately May 2015, Synchrony Financial filed an application with the Federal Reserve Board seeking approval to operate as a publicly owned savings and loan holding company and to retain control of Synchrony Bank. On October 14, 2015, the Federal Reserve Board approved the application, noting that even though Synchrony Bank would have adequate financial resources as a stand-alone company, a split-off from GE would "eliminate GE as a source of strength" for Synchrony Bank.

50. On November 17, 2015, GE completed the split-off of Synchrony Financial, completing its offer to exchange shares of GE common stock for all the remaining shares of Synchrony Financial common stock that were owned by GE. Synchrony Financial's 10-K for 2015 refers to this November 17, 2015 event as the "Separation": afterwards, GE no longer owned any of the outstanding Synchrony Financial common stock.



51. ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████ Synchrony Financial's SEC filings revealed that its ██████ cost of funds was 1.9% for year-end 2017; 1.85% for year-end 2016; and 1.83% for year-end 2015. ██████

████████████████████████████████████████ In 2016, for example, ██████

Synchrony's publicly reported cost of funds was 1.85%, ████████████████████

████████████████████

52. ████████████████████ ████████ ████ ███ ███
████████████████████████████ ████████████████
████████████████████████ ████████████████ ███
████████████████████████ ███ ███ ███ ███ ████
███ ██████████████ ██████████████████████████
███ █████████████ ██ ████████ ██████████ ████
███ █████████████████ █████████████████

53. ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

**3.** <u>**Synchrony Breached the Agreement by**</u> ████████ ████ ████
████ ████████████████

54. ████ ████ ██████████ ███ ██ ████████████ █
███ █████ ██████ ████████████████████████ ███
██████████ ████████████

55. ██████████ ████ ██ ████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████ ██████ ████████████████████ █████ ██
████████████

56. 

57.     In 2017, however, Congress passed and President Trump signed P.L. 115-97, commonly referred to as the "Tax Cut and Jobs Act." As was widely reported at the time, the law cut U.S. corporate tax rates from their previous rate of 35% to a permanently lower rate of 21%.

58.     Synchrony benefited from the corporate tax cut. The company's form 10-Q for the six months ended June 30, 2018, reported: "The effective tax rate for the three and six months ended June 30, 2018 decreased compared to the same period in the prior year primarily due to the reduction in the corporate tax rate from 35% to 21%." Thus, Synchrony reported an "Effective tax rate" of 23.2% for the six months ended June 30, 2018—slightly different from the applicable U.S. federal statutory rate primarily due to state income taxes.



████████████████████████  ████████████████████████

██████  ██████  █  ████████████████████████████

████████████████  ██████  ██████  ████████████████

████████  ████████████████████  ████████████████

61.   ████████████  ████████  █████  █████  ███████████

██████████████████████████████  ████████████████

██████████████████  ██████████████████  ████████████

██████  ████████████████  ████████████  ████████████

████████████████  ████████████████████  ████████████

████████  ██████  ████████

62.   ██████████████████████████████████████  ██

████████  ████████████  █████  █████████████████████████

█████  █  ████████████  ████████████████.

### FIRST CLAIM FOR RELIEF

**Breach of Contract:** ████████████████████████████████

63.   Walmart realleges and reasserts the foregoing allegations.

64.   The Agreement is a contract between Walmart and Synchrony.

65.   Walmart has complied with the Agreement.

66.   Synchrony has breached the Agreement by ██████████  ████████████

████████████  ████████████  █  ████████████████████████  ██████  █

████████████  ████████████  ████████████  ████████████

████████████████  ████████████████████. This is a breach of the contract's

express terms.

67.     Walmart has been damaged by Synchrony's breach in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
**Breach of the Implied Covenant of Good Faith and Fair Dealing:** ████████

68.     Walmart realleges and reasserts the foregoing allegations.

69.     The Agreement is a contract with an implied covenant of good faith and fair dealing. Synchrony has impliedly promised that it will not intentionally or purposely do anything which will destroy or injure Walmart's right to receive the fruits of the contract.

70.     Walmart has complied with the Agreement.

71.     Synchrony has breached the implied covenant of good faith and fair dealing by ████████ ████████████ ████████ █ ████████ ████████████████████ ████████████████████ ████ This conduct constitutes breaches of the implied covenant of good faith and fair dealing: Synchrony has intentionally prevented Walmart from receiving the fruits of the contract ████ ████████ ████████ ████ █ ████████ ████████ ████ ████████

72.     Walmart has been damaged by Synchrony's breach in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF
**Breach of Implied Covenant of Good Faith and Fair Dealing:** ████████

73.     Walmart realleges and reasserts the foregoing allegations.

74.    The Agreement is a contract with an implied covenant of good faith and fair dealing. Synchrony has impliedly promised that it will not intentionally or purposely do anything which will destroy or injure Walmart's right to receive the fruits of the contract.

75.    Walmart has complied with the Agreement.

76.    Synchrony has breached the implied covenant of good faith and fair dealing by

. This is a breach of the implied covenant of good faith and fair dealing: Synchrony has intentionally injured Walmart's right to receive the fruits of the contract .

77.    Walmart has been damaged by Synchrony's breach in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
### Breach of Contract: ▇

78.    Walmart realleges and reasserts the foregoing allegations.

79.    The Agreement is a contract between Walmart and Synchrony.

80.    Walmart has complied with the Agreement.

81.    Synchrony has breached the Agreement by ▇▇



. This is a breach of the contract's express terms.

82.    Walmart has been damaged by Synchrony's breach in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### Breach of Implied Covenant of Good Faith and Fair Dealing: ▮▮▮▮▮

83.     Walmart realleges and reasserts the foregoing allegations.

84.     The Agreement is a contract with an implied covenant of good faith and fair dealing. Synchrony has impliedly promised that it will not intentionally or purposely do anything which will destroy or injure Walmart's right to receive the fruits of the contract.

85.     Walmart has complied with the Agreement.

86.     Synchrony has breached the implied covenant of good faith and fair dealing by

 This is a breach of the implied covenant of good faith and fair dealing: Synchrony has intentionally injured Walmart's right to receive the fruits of the contract ▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮ ▮▮ ▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮.

87.     Walmart has been damaged by Synchrony's breach in an amount to be proven at trial.

## DEMAND FOR JURY TRIAL

Walmart demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Walmart prays judgment should be entered as follows:

1.     Damages awarded to Walmart to compensate it for the harm it has suffered, in an amount to be proven at trial but estimated to be no less than $800 million;

2.     Prejudgment and postjudgment interest;

3.     An award of the costs of suit, including reasonable attorneys' fees; and

4.     Such other and further relief as this Court deems just, equitable, and proper.

Dated this 1st day of November, 2018.

27

WALMART INC.
WAL-MART STORES EAST, LLC
WAL-MART STORES EAST, L.P.
WAL-MART.COM USA, LLC
WAL-MART    STORES    ARKANSAS,    LLC
WAL-MART STORES TEXAS, LLC
WAL-MART LOUISIANA, LLC,
WAL-MART PUERTO RICO, INC.

Plaintiffs

By: _____

Neal Manne, AR 2017083
Susman Godfrey LLP
1000 Louisiana Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666
nmanne@susmangodfrey.com

Drew Hansen (*pro hac vice* forthcoming)
Bar No. 30467 (WA)
Susman Godfrey LLP
1201 Third Avenue Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3880
Fax: (206) 516-3883
dhansen@susmangodfrey.com

Steven Shepard (*pro hac vice* forthcoming)
Bar No. 5291232 (NY)
Cory Buland (*pro hac vice* forthcoming)
Bar No. 4842654 (NY)
Susman Godfrey LLP
1301 Avenue of the Americas, 32 FL
New York, NY 10019
Telephone: (212) 336-8330
Fax: (212) 336-8340
sshepard@susmangodfrey.com
cbuland@susmangodfrey.com

28

Russell Atchley, AR 82007
Samantha B. Leflar, AR 2010190
Kutak Rock LLP
234 East Millsap Road, Suite 200
Fayetteville, AR  72073
Telephone: (479) 973-4200
Fax: (479) 973-0007
Russell.Atchley@KutakRock.com
Samantha.Leflar@KutakRock.com

Bartholomew L. McLeay, Esq.
Kutak Rock LLP (*pro hac vice* forthcoming)
1650 Farnam Street
Omaha, NE 68102
Telephone: (402) 346-6000
Fax: (402) 231-8775
Bart.Mcleay@kutakrock.com